## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL TRENTLY, et al.,

                         Plaintiffs,

     v.

GOVERNMENT OF AMERICA,

                   Defendant.

CIVIL ACTION NO. 3:19-CV-01836

(MEHALCHICK, J.)

## MEMORANDUM

Before the Court is the motion to dismiss for lack of subject matter jurisdiction, and/or for summary judgment filed by the United States. (Doc. 49). Plaintiffs Special Deputy United States Marshal Michael Trently ("SpDUSM Trently ") and Amy Trently ("Mrs. Trently") (collectively, "Plaintiffs") initiated this action on October 23, 2019, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, against Defendants the United States of America ("Government") and the City of Scranton.[1] (Doc. 1). For the reasons set forth below, the motion to dismiss will be **GRANTED**.

I.    **BACKGROUND AND PROCEDURAL HISTORY**

This factual background is taken from the Government's statement of material facts and accompanying exhibits. (Doc. 52; Doc. 52-1-52-16). Plaintiffs have filed a response to SpDUSM Trently's statement of facts. (Doc. 62-1-62-7). Where Plaintiffs dispute facts and support those disputes in the record, as required by Local Rule 56.1, those disputes are noted. Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. In addition,

---

[1] The City of Scranton was terminated from this action on September 8, 2020. (Doc. 36).

the facts have been taken in the light most favorable to the Plaintiffs, as the non-moving parties, with all reasonable inferences drawn in their favor.

The Commonwealth of Pennsylvania Board of Probation and Parole ("the Board") employed SpDUSM Michael as a parole agent. (Doc. 52, ¶ 1; Doc. 52-1, at 25, ¶¶ 5-8). Robert Jones is currently and was the Director of Probation and Parole during the time that SpDUSM Trently was a parole agent. (Doc. 52, ¶ 2; Doc. 52-1, at 26-27). In January 2015, the Board announced an opportunity to be a task force officer ("TFO") to work with the United States Marshal Service ("USMS"). (Doc. 52, ¶ 4; Doc. 52-1, at 26, ¶ 11 to 27 ¶ 23). The Board and the USMS entered into a Memorandum of Understanding (MOU) to investigate and arrest fugitive matters as part of a task force between the USMS and local law enforcement partners.[2] (Doc. 52, ¶ 7; Doc. 52-2, at 1). The MOU provides that the USMS is in charge of the direction and coordination of the Task Force and administrative matters which are internal to the participating agency remain the responsibilities of the participating agency.[3] (Doc. 52, ¶ 8; Doc. 52-2, at 2).

---

[2] SpDUSM Trently denies this assertion in part, stating:

It is admitted Pennsylvania Board Probation and Parole entered into a MOA and the primary mission of the task force is to investigate and arrest, as part of joint law enforcement operations, persons who have active state and federal warrants for their arrests. The MOU in effect on March 16, 2015, is reflected MOU (Def. Ex. B) at Def-at 288-291.

(Doc. 60, ¶ 7; Doc. 52-2, at 1-5).

[3] SpDUSM Trently denies this assertion in part, stating:

It is admitted the MOU in effect paragraph entitled Supervision reflects inter alia. Direction and coordination of the VOTF shall be the responsibility of the USMS Chief Deputy. Administrative matters which are internal to the participating agency remain the responsibility of the respective agencies. The MOU also reflects, furthermore, each agency retains responsibility for the conduct of its personnel. MOU section Release of Liability reflects "Each agency shall be responsible for the acts or omissions of its employees. Participating agencies or their employees shall not be considered as the

SpDUSM Trently's supervisor/coordinator was Deputy Government Marshal (DUSM) Joseph Brozowski. (Doc. 52, ¶ 10; Doc. 52-4, at 2). DUSM Brozowski was the warrant coordinator at the time and his duties included overseeing the day-to-day operations of the warrant squad, coordinating investigative activities requesting assets for operations, and reviewing overtime. (Doc. 52, ¶ 11; Doc. 52-9, at 12, ¶¶ 4-22; Doc. 60, ¶ 11). The USMS gave SpDUSM Trently a security clearance. (Doc. 52, ¶ 12; Doc. 52-5, at 1). SpDUSM Trently agreed to comply with the USMS computer account systems protocols. (Doc. 52, ¶ 13; Doc. 52-6, at 1-2; Doc. 60, ¶ 13).

When SpDUSM Trently became a Task Force Office for the USMS, he took an oath of office. (Doc. 52, ¶ 14; Doc. 52-1, at 38 ¶ 25 to 39 ¶ 2). The Oath of Office provided that:

> I will faithfully execute all lawful orders issued under the authority of the Government directed to the Government Marshal, the Government Marshals Service, or an appropriate Federal Official. I will perform the duties of a Special Duty Government Marshal with integrity, professionalism, and impartiality. I will exercise the authorities as limited by this Special Deputation solely in furtherance of the mission for which I have been specially deputized, and only while this Special Deputation shall be in effect.

(Doc. 52, ¶ 15; Doc. 52-7, at 1).

SpDUSM Trently's schedule as a TFO, including when he reported to the United States Courthouse, depended upon his work with Probation and Parole. eported to the United States Courthouse to work as a TFO. (Doc. 52, ¶ 17; Doc. 52-1, at 39, ¶¶ 7-19; Doc. 60, ¶ 17; Doc. 62-5, ¶¶ 8-10; 14-15)). Whether SpDUSM Trently could decline assignments by USMS superiors is in dispute. (Doc. 52-1, at 40-46; 54-58; 60; Doc. 52, ¶ 18; Doc. 52-10, at 2; Doc.

---

agents of any other participating agency. Nothing herein waives or limits sovereign immunity under federal or state statutory constipate constitutional law. id at DEF -291.

(Doc. 60, ¶ 8; Doc. 52-2, at 1-5).

52-11, at 2). SpDUSM Trently received the USMS Standard Operating Procedures ("SOP") and understood that he had to follow them. (Doc. 52, ¶ 19; Doc. 52-1, at 46, ¶¶ 10-15). Pursuant to the MOU between the Board and the USMS, the USMS was responsible for direction and coordination of the task force, while administrative matters were the purview of the agency. (Doc. 52-5, at 2). SpDUSM Trently was required to follow the operational commands of the USMS. (Doc. 52, ¶ 20; Doc. 52-11, ¶ 5).

On March 16, 2015, the USMS, and not the Board, supervised SpDUSM Trently's actions during the pursuit of the fugitive Weitz. (Doc. 52, ¶ 22; Doc. 52-11, ¶ 7). According to SpDUSM Trently, his plan for the day was to search for Weitz with a colleague from Probation and Parole, but once he found out that colleague was ill, he called SpDUSM Hegedus, a TFO with the USMS from the City of Scranton Police Department. (Doc. 52, ¶ 24; Doc. 52-1, 62, ¶ 14 to 63, ¶ 24). SpDUSM Trently had in his possession a valid Pennsylvania Board of Probation and Parole arrest warrant for Weitz (Doc. 60, ¶ 22; Doc. 62-3). However, Weitz had an open felony criminal charge of aggravated assault, simple assault, and related offenses and Duryea Police and Probation and Parole had warrants for the suspect's arrest. (Doc. 52, ¶ 25; Doc. 52-12, at 3). SpDUSM Hegedus had adopted the warrant for Weitz issued by the Duryea Police Department on March 13, 2015.[4] (Doc. 52, ¶ 27; Doc. 52-13, at 3). Although Probation and Parole had a warrant for Mr. Weitz, that warrant was not adopted. (Doc. 52, ¶ 31; Doc. 52-10, ¶ 13). Because the USMS did not adopt

---

[4] When the USMS "adopts" a warrant, it is taking the lead in the investigation to find a fugitive. (Doc. 52, ¶ 28; Doc. 52-9, at 19 ¶ 21 to 20 ¶ 8). At the time, the USMS had an operation at the time known as Operation Violence Reduction 7, an agency-wide initiative for geographic areas, and Weitz was part of that operation, though he denies knowing anything about that initiative. (Doc. 52, ¶ 29; Doc. 52-9, at 14 ¶¶ 9-21).

that warrant, the DUSMs, and the SpDUSMs could not execute that Probation and Parole warrant. (Doc. 52, ¶ 31; Doc. 52-10, ¶ 13). The warrant executed on March 16, 2015 was the warrant adopted by the Duryea Police Department. (Doc. 52-13, at 3).

      SpDUSM Trently met with SpDUSM Hegedus at the Scranton Federal Courthouse and got in his vehicle to pursue the fugitive. (Doc. 52, ¶ 35; Doc. 52-1, at 68 ¶¶ 16-20). SpDUSM Hegedus drove the vehicle, DUSM Lenahan sat behind SpDUSM Hegedus, SpDUSM Trently sat in the passenger seat, and DUSM Summa sat behind SpDUSM Trently. (Doc. 52, ¶ 36; Doc. 52-1, at 69 ¶¶ 17-22). DUSM Brozowski and SpDUSM Conners also drove from the Scranton Federal Courthouse, but took another vehicle. (Doc. 52, ¶ 38; Doc. 52-1, at 70 ¶¶ 8-11). The vehicles planned and drove to the Duryea Police Department where Duryea informed the DUSMs about another assault charge for the suspect and the Police gave information about a girlfriend who lives in West Pittston. (Doc. 52, ¶ 39; Doc. 52-1, at 67 ¶ 16; 68 ¶ 10). The girlfriend told the DUSMs that the suspect was possibly on South River St. in Wilkes-Barre. (Doc. 52, ¶ 40; Doc. 52-1, at 67 ¶ 16; 68 ¶ 10). The vehicles arrived on South River St. and saw the suspect's car, they went at least a tenth of a mile down the street, turned into a parking lot, and parked side by side at the entry of the parking lot facing South River Street to set up surveillance. (Doc. 52, ¶ 41; Doc. 52-1, at 68 ¶¶ 5-10; at 70 ¶ 8; 71 ¶ 19). After a few minutes in the parking lot, SpDUSM Hegedus announced that he saw movement and the vehicles exited the lot to proceed to the suspect's car's location. (Doc. 52, ¶ 43; Doc. 52-1, at 77 ¶¶ 9-12). As SpDUSM Hegedus' car approached the suspect, SpDUSM Trently believed the suspect was in the process of opening his car door. (Doc. 52, ¶ 44; Doc. 52-1, 78 ¶ 12, 79 ¶ 9). SpDUSM Trently testified that SpDUSM Hegedus was going 45-50 miles per hour when he approached the suspect's vehicle, and SpDUSM Trently thought it prudent to

jump out of the car because he was "in a very dangerous situation [b]ecause we're driving at a high rate of speed. We're driving essentially blindly in an unmarked vehicle with no lights and sirens directly coming up to a violent offender who we have reason to believe may even possibly be armed from previous interviews." (Doc. 52, ¶ 47; Doc. 52-1, at 82 ¶ 16; 83 ¶ 15). When the car slowed down, SpDUSM Trently opened his door and his door collided with the suspect's vehicle. (Doc. 52, ¶ 48; Doc. 52-1, at 84 ¶¶ 4-24). SpDUSM Trently believes that the impact of the two doors slammed him back and caused him injury. (Doc. 52, ¶ 49; Doc. 52-1, at 86 ¶¶ 13-19; 90 ¶¶ 11-22). SpDUSM Trently conceded that he was never trained to open the door of a moving car in pursuit of a felon. (Doc. 52, ¶ 49; Doc. 51-1, at 86 ¶¶ 20-23).

SpDUSM Hegedus testified that there was a verbal plan wherein the suspect was to go to the house and do an interview and when the suspect exited the home, the USMS-driven cars would park in front of the suspect's car to block the car from being able to move. SpDUSM Trently denies that there was a plan. (Doc. 52, ¶ 51; Doc. 52-14, at 97 ¶¶ 9-23; (Doc. 60, ¶ 51). SpDUSM Hegedus told SpDUSM Trently not to jump out of the car. (Doc. 52, ¶ 52; Doc. 52-14, at 56 ¶ 1 to 60 ¶ 10). DUSM Brozowski decided to transport SpDUSM Trently to the hospital to treat his injuries. (Doc. 52, ¶ 53; Doc. 52-9, at 41 ¶¶ 8-22, at 43 ¶¶ 4-17). DUSM Summa said to DUSM Brozowski: "I can't believe he jumped out of a moving vehicle. (Doc. 52, ¶ 54; Doc. 52-9, at 46 ¶¶ 1-6). DUSM Summa told SpDUSM Hegedus that "SpDUSM Trently jumped out of the car and it was his own fault basically." (Doc. 52, ¶ 55; Doc. 52-15, at 14 ¶¶ 4-9). DUSM Summa saw the suspect enter the vehicle as the DUSM cars approached. (Doc. 1, ¶ 56; Doc. 52-15, at 27 ¶¶ 2-23). As they approached the vehicle, both DUSM Summa and SpDUSM Hegedus told SpDUSM Trently not to jump out of the moving car. SpDUSM Trently denies that SpDUSM Hegedus and or DUSM Summa told SpDUSM

Trently not to jump out of the car or that SpDUSM Trently jumped out of a moving car. (Doc. 1, ¶ 57; Doc. 52-15, at 30, ¶¶ 12-18; 38 ¶ 23 to 39 ¶ 4; Doc. 60, ¶ 57; Doc. 52-15, at 30 ¶ 18, 38 ¶¶ 20-23).

DUSM Summa said she saw the suspect stay in his car with the door wide open. (Doc. 52, ¶ 58; Doc. 52-15, at 31 ¶¶ 2-6). DUSM Summa saw SpDUSM Trently open his door and the door collided with the suspect's car door. SpDUSM Trently got hit by the door and jumped out of the car to pursue the suspect. (Doc. 52, ¶ 59; Doc. 52-15, at 31 ¶ 22 to 35 ¶ 4). SpDUSM Hegedus did not see the suspect in his vehicle. (Doc. 52, ¶ 60; Doc. 52-14, at 56 ¶¶ 14-2).

Although all pursuits of felons are situational, the USMS does not train DUSMS to open the door of a moving vehicle or to jump out of it when pursuing a felon. (Doc. 52, ¶ 61; Doc. 52-10, ¶ 17). Such practice would violate general safety standards and put other DUSMs and SpDUSMs at risk of injury. (Doc. 52, ¶ 61; Doc. 52-10, ¶ 17). Trently disputes that SpDUSM Hegedus' actions were appropriate, and that he should have followed the City of Scranton Police Department's Policies, which state that "[n]o task, response, or pursuit shall justify the reckless disregard of the safety of innocent persons" and further, that officers should comploy with all Pennsylvania vehicle and crime codes.  (Doc. 60, ¶ 63, Doc. 62-2, at 1-2; Doc. 62-4, at 1-2). Under USMS policies and procedures, SpDUSM Hegedus did not have to place his sirens on or use the public address system before trying to block Weitz's parked car from moving out of the parked location. (Doc. 52, ¶ 63; Doc. 52-10, ¶ 19). Activating sirens would be appropriate after the USMS-driven car was in place to block the suspect's car to alert other drivers of the emergency. (Doc. 52, ¶ 64; Doc. 52-10, ¶ 20). In this case, the USMS-driven car was not able to pull directly in front of Weitz's car because SpDUSM Trently

opened the door of a moving vehicle, which collided with the open door of a parked car. (Doc. 52, ¶ 64; Doc. 52-10, ¶ 20). SpDUSM Trently filed for worker's compensation and was paid pursuant to section 319 of the Pennsylvania Worker's Compensation Act. (Doc. 52, ¶ 65; Doc. 52-16).

On October 23, 2019, Plaintiffs refiled their suit by filing a complaint in this Court, after exhausting their administrative remedies.[5] (Doc. 1). On December 27, 2019, the City of Scranton filed a motion to dismiss for failure to state a claim, and the Government filed a motion to dismiss on February 6, 2018. (Doc. 10; Doc. 18). On September 8, 2020, the Court granted the City of Scranton's motion to dismiss (Doc. 10), terminating the City of Scranton as a Defendant and denied the Government's motion to dismiss (Doc. 18; Doc. 46). On March 10, 2021, the Government filed an answer to Plaintiffs' complaint. (Doc. 39). On October 18, 2021, the Government filed a motion to dismiss for lack of jurisdiction and/or for summary judgment. (Doc. 49). Following an Order granting the Government's unopposed motion for an extension of time to file supporting motions to its motion for summary judgment (Doc. 56; Doc. 59), the Government filed a statement of facts and brief in support of its motion on November 15, 2021. (Doc. 52; Doc. 53). On January 5, 2022, Plaintiffs filed

---

[5] On January 25, 2018, the Plaintiffs filed a complaint in the Court of Common Pleas of Lackawanna County against SpDUSM Hegedus, the City of Scranton, and Weitz. On March 15, 2018, the Government substituted itself for SpDUSM Hegedus as a party, certifying that SpDUSM Hegedus was acting within the scope of his employment for the Task Force, and filed a notice of removal under 18 U.S.C. § 1442(a)(2). The Government filed a motion to dismiss for lack of subject matter jurisdiction on March 29, 2018, and on April 3, 2018, and Scranton filed a motion to dismiss. On November 116, 2018, the Court dismissed Plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). (Doc. 1, ¶¶ 1-4); *See Trently v. Government*, No. 3:18-CV-00602, 2018 WL 6018890, at *1-4 (M.D. Pa. Nov. 16, 2018).

an answer to the Government's statement of facts as well as an additional statement of facts.[6] (Doc. 60; Doc. 61). Also on January 5, 2022, Plaintiffs filed a brief in opposition to the Government's motion to dismiss for lack of jurisdiction and/or summary judgment. (Doc. 62). Following an Order granting the Government an extension of time, the Government filed a reply brief on February 2, 2022. (Doc. 65). The Court heard oral argument on the pending motion on April 1, 2024. (Doc. 72). The motion for summary judgment is currently ripe and ready for disposition. (Doc. 49; Doc. 52; Doc. 53; Doc. 60; Doc. 61; Doc. 62; Doc. 65).

## II.   LEGAL STANDARD

### A.   SUMMARY JUDGMENT[7]

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might

---

[6] The Local Rules of this Court do not permit a party opposing a summary judgment motion to do so by way of the presentation of his or her statement of facts but the Court will consider all evidence of record, viewed in the light most favorable to Plaintiffs, in addressing the Government's motion. Accordingly, the Court has taken note of the record evidence referenced by Plaintiffs by way of his statement of additional facts. *Seyoum v. HM Health Sols., Inc.*, No. 1:18-CV-00854, 2020 WL 7027586, at *16 (M.D. Pa. Nov. 30, 2020).

[7] When a party moves to dismiss, but where "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The decision of whether a motion to dismiss should be converted into a motion for summary judgment is left to the sound discretion of the district court. *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 n.11 (3d Cir. 1992). Typically, when a court converts a motion to dismiss into a motion for summary judgment under Rule 56, notice must be given to all parties of the Court's intent to do so. *See* Fed. R. Civ. P. 12(d); *Garcia v. Newtown Twp.*, No. 09-CV-3809, 2010 WL 785808, at *3 (E.D. Pa. Mar. 5, 2010). However, if a motion to dismiss has been filed with an alternative request for summary judgment, the alternative filing is sufficient to place the parties on notice that summary judgment might be entered. *Rivera v. Finley*, 2022 WL 14915563, at *3 (M.D. Pa. 2022); citing *Latham v. United States*, 306 Fed. Appx. 716, 718 (3d Cir.2009) (citing *Hilfirty v. Shipman*, 91 F.3d 573, 578–79 (3d Cir.1996), *overruled on other grounds, Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000)).

affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the nonmovant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.' " *Velentzas v. U.S.*, No. 4: 07-CV-1255, 2010 WL 3896192, at *7 (M.D. Pa. Aug. 31, 2010) (quoting *Goode v. Nash*, 241 F. App'x 868, 869 (3d Cir. 2007)) (citation omitted); *see also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring

10

parties to cite to particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Velentzas*, 2010 WL 3896192, at *7 (quoting *Goode*, 241 F. App'x at 869). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the nonmovant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

## III.  DISCUSSION

Moving for summary judgment, the Government claims SpDUSM Trently was a "borrowed employee," on the date of the incident and, therefore, the Government is immune from liability under the exclusivity provision of the Pennsylvania Workers' Compensation Act (WCA), 77 P.S. § 481(a).[8] (Doc. 53, at 4-8). In opposition, SpDUSM Trently argues that he was not a borrowed employee of the USMS for the purposes of the Borrowed Servant Doctrine. (Doc. 62, at 5).

[T]he borrowed servant doctrine is an outgrowth of the common law rule that a servant who is loaned by his master to a third party is regarded as the servant of that third party while under that third party's direction and control. The "borrowing employer" is thus the

---

[8] "[T]he WCA requires employers to pay employees who are injured on the job workers' compensation benefits regardless of negligence[,]" in exchange for which employers receive immunity from tort liability with respect to work-related injuries. *Brown v. Gaydos*, A.3d, 2023 PA Super 258, *3 (Pa. Super. Dec. 7, 2023) (*en banc*) (citation omitted); *See also* 77 P.S. § 481(a).

common-law master of the borrowed employee — and, by definition, the borrowing employer cannot be a statutory employer .... *Shamis v. Moon*, 81 A.3d 962, 969–70 (Pa. Super. 2013) (citations & quotation marks omitted; emphasis in original).

The courts of Pennsylvania have applied the following test to determine whether an injured worker is a "borrowed employee" for purposes of WCA immunity:

> The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. Other factors that may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor. Although the examination of these factors guides the determination, each case must be decided on its facts.

*Burrell v. Streamlight, Inc.*, 222 A.3d 1137, 1139–40 (pa. Super. 2019) (emphasis in original), *citing JFC Temps, Inc. v. W.C.A.B. (Lindsay)*, 680 A.2d 862, 864 (Pa. 1996).

Here, it is undisputed that the Board employed SpDUM Trently as a parole agent and that the USMS retained him as a TFO pursuant to an MOU between the Board and the USMS. (Doc. 52, ¶¶ 6-7; Doc. 60, ¶¶ 6-7). However, Pennsylvania courts have addressed situations similar to the one presented here and have held that under the borrowed employee doctrine, a worker hired and paid by an agency that provides workers to other companies is ***the employee of the entity to which he is assigned to work where that latter entity supervises and directs his work***. *JFC Temps,* 680 A.2d at 863-66 (emphasis added); *English v. Lehigh County Auth.,* 428 A.2d 1343, 1349 (1981) (holding that worker was an employee of the government entity to which he was assigned because the government entity directed how the work was to be performed and there were no supervisory personnel from employer at the government entity's facilities); *Burrell,* 222 A.3d at 1142 (holding that plaintiff was the employee of the

12

company to which he was assigned, even though the contract provided that he was hired and paid by a different company and all scheduling and/or requests for leave or other accommodations must be made solely and directly to a different company, because the company to which he was assigned had the right to control plaintiff's work and the manner in which it was performed).

Here, the undisputed facts demonstrate that while the Board retained some control over SpDUSM Trently, the USMS exercised control over him as a TFO. *See English.,* 428 A.2d at 1349. Per the terms of the MOU, the USMS is in charge of the direction and coordination of the Task Force. (Doc. 52, ¶¶ 7-8; Doc. 52-2, at 1-2). Upon his appointment as a TFO, SpDUSM Trently took an oath of office and agreed to "faithfully execute all lawful orders issued under the authority of the Government directed to the Government Marshall." (Doc. 52, ¶¶ 14-15; Doc. 62, ¶¶ 14-15; Doc. 52-1, at 38-39; Doc. 52-7). SpDUSM Trently concedes that when the USMS adopts a warrant, they take the lead in the investigation. (Doc. 52, ¶ 28; Doc. 60, ¶ 28). The USMS adopted the March 16, 2015 Duryea warrant for Weitz, and it was the Duryea warrant that was executed.[9] (Doc. 52, ¶ 27; Doc. 52-13, at 1-3). SpDUSM Trently admits that he understood that he was to follow the direction of DUSM Brozowski as well as the USMS's SOP.[10] (Doc. 52, ¶ 33; *see* Doc. 60, ¶ 33; Doc. 52, ¶ 14).

---

[9] SPDUSM Trently argues that he initiated the March 16, 2015, warrant execution from a Pennsylvania State Warrant that was already in his caseload as a parole officer. (Doc. 62, at 7-8). This argument fails for two reasons. First, as the Government points out, the MOU between the Board and USMS provides that "[e]ach participating agency agrees to refer cases for investigation by the DFTF (District Fugitive Task Force) [and] [c]ases will be adopted by the DFTF at the discretion of the District Chief Deputy." (Doc. 52-2, at 1). Furthermore, the USMS adopted the March 16, 2015, arrest warrant from the Duryea Police Department, not the Board's arrest warrant. (Doc. 52-13, at 1-3).

[10] SpDUSM Trently testified that he was to follow the direction of DUSM Brozowski unless his direction conflicted with the Board's policy. (Doc. 52-1, at 43). SpDUSM Trently

13

Additionally, SpDUSM Trently reported to the United States Courthouse when he worked as a TFO. (Doc. 51, ¶ 17; Doc. 51-2, at 39 ¶¶ 7-19; Doc. 60, ¶ 17). SpDUSM Trently submitted a monthly time sheet to reflect hours worked for the USMS, and DUSM Brozowski signed off on those hours. (Doc. 52, ¶¶ 8-11; Doc. 52-4, at 2). SpDUSM Trently received a security clearance as well as a badge and credentials from the USMS and agreed to comply with USMS computer system protocols. (Doc. 52, ¶¶ 12-13, 16-17; Doc. 52-5, at 1; Doc. 52-6, at 1-2; Doc. 52-8, at 1-2; Doc. 60, ¶ 16). Such facts are sufficient to establish that for the purposes of the WCA, the USMS employed SpDUSM Trently. *See O'Donnell v. New England Motor Freight, Inc.*, No. 4:06-CV-1068, 2009 WL 674131, at *5 (M.D. Pa. Mar. 13, 2009), *aff'd sub nom. O'Donnell v. New England Motor Freight*, 373 F. App'x 182 (3d Cir. 2010) (holding that plaintiff was a borrowed employee of defendant for purposes of the WCA where plaintiff reported to defendant supervisors at defendant's facility and used equipment supplied by the defendant, no representative of plaintiff's original employee was present at defendant's facility, defendant determined plaintiff's work hours and approved his time card and could terminate his assignments and "importantly, it is undisputed that [defendant] had the right to

---

also argues that none of the USMS's SOPs were enforced on March 16, 2015. (Doc. 62, at 8). In support of his assertion, SpDUSM Trently submits testimony from DUSM Summa stating that she was unsure of what a Situation Operational Planning Checklist was or whether she was provided one and believed that an Operational Plan and briefing packet were synonymous. (*See* Doc. 62-6, at 12; Doc. 52-15, at 49-51). However, the Court does not find that this evidence undermines the USMS's showing of control. First, the record does not demonstrate that USMS and Board policies were ever in conflict such that SpDUSM Trently was not under the command of DUSM Brozowski. Second, there is no evidence that if the USMS SOPs were enforced on that day, DUSM Brozowski would not have been required to follow them. *See Mason v. Ne. Architectural Prod.*, No. 735 MDA 2023, 2023 WL 8827960, at *7 (Pa. Super. Ct. Dec. 21, 2023) (noting that the focus of the inquiry is whether entity has the right to control the work to be done as well as the manner of performing it, regardless of whether it "actually exercised" that control) (citing *Burrell*, 222 at 1139-40).

control the work [plaintiff] did and the performance of that work."); *Zaragoza v. BASF Const. Chems., LLC,* No. 08–96, 2009 WL 260772, at *3 (E.D.Pa. Feb. 3, 2009) (applying doctrine where an employee reported directly to the employer daily, received training, hours, and work assignments from its personnel, used its equipment, and wore name badge with its logo).

Plaintiffs argue that the record contains disputed issues of material fact as to whether SpDUSM Trently was a borrowed servant because the USMS did not control his daily actions, conduct, or schedule, and because he could decline work from the USMS and had no minimum hour requirement in which he was required to work for the USMS.[11] (Doc. 62, at 7-8; *see* Doc. 52-1, at 40, 45). Furthermore, SpDUSM Trently points to the "Supervision" portion of the MOU in effect on March 16, 2015, stating that any matters that are "internal to the participating agency" remain the responsibility of the respective agency and each agency retains responsibility for the conduct of its personnel. (Doc. 62, at 5-10). However, even though the Board considered SpDUSM Trently its employee, that characterization is not determinative of the borrowed servant question. *O'Donnell*, WL 674131, at *5, *aff'd sub nom.*, 373 F. App'x 182 (3d Cir. 2010). Although some factors, such as SpDUSM's ability to decline work or determine his hours weigh against finding that he was a borrowed employee,[12]

---

[11] Plaintiffs cites *Daily Exp., Inc. v. Workmen's Comp. Appeal Bd.,* 406 A.2d 600, 601–02 (1979) (summarizing factors set forth in *Mature v. Angelo*, 373 Pa. 593, 97 A.2d 59 (1953), a leading case on the borrowed servant doctrine), asserting that it stands for the proposition that there are "factors" other than control which may be relevant in determining whether an employee is borrowed. (Doc. 62, at 5-6).

[12] The Court does not find the dispute in the record as to whether SpDUSM could decline assignments by the USMS superiors to be material, as both the USMS Chief Deputy and Direction of Probation and Parole testified that SpDUSM Trently was required to report to the USMS's offices in Scranton when required by USMS and worked fulltime as a special deputy for the USMS and had to account for his time to the USMS. (Doc. 52-10, ¶ 5a; Doc. 52-11, ¶¶ 4-6).

*see Burrell*, 222 A.3d at 1141; *Duty v. Workers' Comp. Appeal Bd.*, 288 A.3d 139 (Pa. Commw. Ct. 2022) the overriding factor—the right to control the performance of SpDUSM Trently's work weighs heavily in favor of finding that the USMS was a borrowing employer. *O'Donnell v. New England Motor Freight, Inc.*, No. 4:06-CV-1068, 2009 WL 674131, at *5 (M.D. Pa. Mar. 13, 2009), *aff'd* 373 F. App'x 182 (3d Cir. 2010)*; JFC Temps,* 680 A.2d at 865.

SpDUSM Trently's argument that he failed to receive any training from the USMS, and that he already possessed the skillset for executing warrants is also unavailing. (Doc. 62, at 9). Even characterizing SpDUSM as a specialist, his status is but one factor "to consider in determining the presence of the requisite control" and the significance of this factor has "diminished under Pennsylvania law." *Ochs v. Reading Hosp.*, 647 F. App'x 126, 129 (3d Cir. 2016) (citing *JFC Temps,* 680 A.2d at 866 (declining to adopt a blanket rule that exempts specialized employees from the borrowed servant doctrine)). His prior training is insufficient to overcome USMS's undisputed right and exercise of control over SpDUSM Trently's work as a TFO. *See Claudio v. MGS Mach. Corp.*, 798 F. Supp. 2d 575, 582 (E.D. Pa. 2011) (applying borrowed servant doctrine notwithstanding that a separate staffing company "played a part in [the plaintiff's] training"); *Nagle v. TrueBlue, Inc.*, 148 A.3d 946, 955 (Pa. Commw. Ct. 2016) (applying borrowed servant doctrine notwithstanding that a separate staffing company provided the plaintiff "with general safety training"); *Haubrich v. Lyondell Chem. Worldwide, Inc.*, No. 01-cv-1955, 2001 WL 1160590, at *1 (E.D. Pa. Aug. 1, 2001) (applying borrowed servant doctrine notwithstanding that the plaintiff had received two years of prior training as a chemist).

Because the USMS was SpDUSM's Trently's employer for the purposes of the WCA, the Government immune from tort liability for the Plaintiffs' workplace injury.[13] *Burrell*, 222 A.3d at 1143. Accordingly, the Government's motion for summary judgment is **GRANTED** and the Plaintiffs' complaint is dismissed with prejudice.

An appropriate Order follows.

**BY THE COURT:**

**Dated: July 9, 2024**                    *s/ Karoline Mehalchick*
                                           **KAROLINE MEHALCHICK**
                                           **United States District Judge**

---

[13] Given the Court's determination that the Government was SpDUSM Trently's employer under the borrowed servant doctrine, it will not address the United States' other arguments.

17